No. 99-531

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 309

302 Mont. 431

15 P.3d 1198

ROSE STUART and DOUGLAS STUART,

Plaintiffs and Appellants,

v.

FIRST SECURITY BANK, HAVRE, MONTANA,

Defendant, Respondent, and Cross-Appellant.

APPEAL FROM: District Court of the Twelfth Judicial District,

In and for the County of Hill,

The Honorable John Warner, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

Larry Jent, Williams & Jent, LLP, Bozeman, Montana

For Respondent:

Chris R. Young, Attorney at Law, Havre, Montana

Submitted on Briefs: March 6, 2000
Decided: December 7, 2000

Filed:

_____

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

¶1 The Plaintiffs, Rose and Douglas Stuart, brought this action in the District Court for the Twelfth Judicial District in Hill County to recover damages incurred when the Defendant, First Security Bank of Havre, denied their loan application. The Stuarts alleged that they were denied an agricultural operating loan by the First Security Bank of Havre in violation of the Montana Human Rights Act, Title 49, Chapter II, MCA. The District Court dismissed the claim following a motion for summary judgment by the Bank. The Stuarts now appeal the judgment of the District Court and the Bank cross-appeals the amount of attorney fees awarded. We affirm the judgment of the District Court.

¶2 While the parties raised several issues on appeal, we restate the issues presented and find the following to be dispositive:

¶3 1. Did the District Court apply the correct standard for deciding this discrimination claim?

¶4 2. Did the District Court err when it awarded summary judgment to the Bank?

¶5 3. Did the District Court err when it awarded the Bank attorney fees?

## FACTUAL BACKGROUND

¶6 Rose Stuart and her son Douglas owned and operated Stuart Farms. During the 1980s, Stuart Farms became the largest farming operation on the Fort Belknap Indian Reservation in northcentral Montana. Rose is an enrolled Assiniboine tribal member on the Fort Belknap Indian Reservation who began farming her mother's allotment in 1962 along with her non-Indian husband Bill Stuart. Douglas, their only son, is recognized by the federal government as a Native American and, as a direct descendant of an original allottee, is allowed to inherit and own reservation property in trust.

¶7 Stuart Farms experienced economic difficulties in the early 1990s. As a result, Rose and Douglas filed for Chapter 11 bankruptcy protection. On January 12, 1993, the Stuarts applied for an agricultural operating loan of $150,000 for the 1993 crop year from First Security Bank of Havre. The loan was to be secured by the assignment of crop insurance and government deficiency payments, along with a first priority lien on all growing crops. While Rose's reorganization plan had been confirmed by the Bankruptcy Court in May 1992, Douglas was still involved in bankruptcy proceedings at the time the Stuarts submitted their loan application.

¶8 On February 8, 1993, Douglas wrote a letter assuring the Bank that his attorney would draft the documents necessary to perfect the Bank's liens on the growing crops. Douglas also offered additional security for the loan in the form of certificates of deposit.

¶9 On February 10, 1993, Bank president Charles R. Celania presented the Stuart loan application to the Executive Loan Committee. Celania mistakenly presented a loan request for approximately $250,000, which represented the loan guarantees proffered by the Stuarts rather than the principal loan amount. The Bank denied the application in a letter dated February 11, 1993. The Bank gave the following reasons for the denial:

> (1) The Executive Loan Committee . . . deemed it to be an unnecessary business risk to try and perfect the liens on the security offered.

> (2) The "father, Bill Stuart, who does the bulk of the work in this farming operation could not be replaced in the event he were incapacitated."

> (3) The loan you are requesting is on the borderline of the type of loan and in the amount for an operation of your size, and is therefore unpalatable when taken in consideration with items 1 and 2.

¶10 On February 12, 1993, Douglas sent a letter to the Bank in which he addressed the concerns outlined in Celania's denial. Douglas recognized that it was "clearly [Stuarts'] obligation and expense" to perfect the liens. Douglas responded to the Bank's concern over management succession by stating that he had ample time to farm under his father's supervision. Based on this additional information, Douglas expressed his desire that the Bank reconsider the loan application. The Bank did not respond to this request.

¶11 On April 12, 1993, Rose, concerned that the Bank's unfavorable opinion of Douglas

jeopardized the application, requested that a loan application for $150,000 be resubmitted to the Committee in her name only. Despite these concerns, Rose continued to include Douglas' assets and crop insurance payments in her resubmitted loan application.

¶12 The Bank denied Rose's resubmitted loan application on April 19, 1993. The Bank based its denial on Rose's 19 percent equity in her operation, her unsatisfactory performance on previous credit arrangements with other financial institutions, and the high risk associated with extending her additional credit.

¶13 During this time, the Bank was being evaluated by the Federal Reserve Board of Minneapolis for its adherence to Community Reinvestment Act (CRA) standards. The FRB performs such audits as a regular part of its responsibilities. One audit dated August 16, 1994, found the Bank to be in "substantial non-compliance" with CRA requirements. In particular, the FRB criticized the Bank's loan denial procedure and provided the Bank with denial forms entitled "Notice of Adverse Action Taken and Principal Reasons." As a result, the Bank issued a "Notice of Adverse Action Taken" form to the Stuarts. The reasons the Bank selected from the denial form included "excessive obligations in relation to income," "value or type of collateral not sufficient," and "management succession."

¶14 The Stuarts filed a claim with the Montana Human Rights Commission on July 21, 1994. In March 1996, the Human Rights Commission issued a right-to-sue letter as required by § 49-2-509, MCA. The Stuarts filed their Complaint with the District Court on November 15, 1996. In their Complaint, the Stuarts alleged that the Bank's denial of the loan based on their racial status as Native Americans and on Rose's status as a Native American woman violated the Montana Human Rights Act and resulted in damages to their real estate, mental and emotional pain and suffering, humiliation, an altered course of life, and other damages. The Stuarts also sought to recover attorney fees pursuant to § 49-2-509, MCA, and punitive damages based on allegations of the Bank's actual malice.

¶15 The District Court granted the Bank's motion for summary judgment on May 5, 1999. The Bank then moved to recover costs pursuant to § 25-10-501, MCA, and attorney fees pursuant to § 49-2-509(6), MCA. The District Court awarded attorney fees in the amount of $4510.00 and costs in the amount of $3191.64. The Stuarts now appeal the District Court's summary judgment and award of attorney fees. The Bank cross-appeals the amount of fees awarded by the District Court.

## STANDARD OF REVIEW

¶16 Our standard of review of appeals from summary judgment is de novo. *Motarie v. Northern Montana Joint Refuse Disposal Dist.* (1995), 274 Mont. 239, 242, 907 P.2d 154, 156. We apply the same criteria which is applied by the district court pursuant to Rule 56 (c), M.R.Civ.P. *Spinler v. Allen*, 1999 MT 1960, ¶ 14, 295 Mont. 139, ¶ 14, 983 P.2d 348, ¶ 14. The moving party must establish both the absence of genuine issues of material fact and entitlement to judgment as a matter of law. *Hadford v. Credit Bureau of Havre, Inc.*, 1998 MT 179, ¶ 14, 289 Mont. 529, ¶ 14, 962 P.2d 1198, ¶ 14. Once the moving party has met its burden, the opposing party must present material and substantial evidence, rather than mere conclusory or speculative statements, to raise a genuine issue of material fact. *Hadford*, ¶ 14.

## DISCUSSION

## ISSUE 1

¶17 Did the District Court apply the correct standard for deciding this discrimination claim?

¶18 The Stuarts contend that the District Court erred when it applied the analysis outlined in *Heiat v. Eastern Montana College* (1996), 275 Mont. 322, 912 P.2d 787, to decide whether the Bank's motion should be granted. The Stuarts argue that "the Court's reliance on the *McDonnell Douglas* presumption, as modified by this Court in [*Heiat*], was misplaced." The Stuarts urge this Court to adopt the "preponderance" standard articulated in *Wright v. Southland Corp.* (11th Cir. 1999), 187 F.3d 1287.

¶19 However, the Stuarts fail to demonstrate how their proposed standard differs from the standard we adopted in *Heiat*. In the summary judgment context where discrimination has been alleged, the plaintiff must allege a prima facie case by establishing that he or she is a member of a protected class and that someone in a different class was treated differently. The employer seeking summary judgment must then come forward with a legitimate, nondiscriminatory reason for the disparity. *Heiat*, 275 Mont. at 331, 912 P.2d at 794. If the employer does so, the plaintiff must not only produce evidence to establish a prima facie case of discrimination, but must also provide evidence which supports at least an inference that the employer's offered reasons are a pretext for discrimination. *Heiat*, 275 Mont at 331, 912 P.2d at 794.

¶20 Application of the *Heiat* standard is dependent on whether the plaintiff is making the

discrimination claim at trial or upon motion for summary judgment. We noted in *Heiat* that the *McDonnell Douglas* trial court analysis was inapposite in the summary judgment context because the plaintiff's burden in each situation differs. *Heiat*, 275 Mont. at 331, 912 P.2d at 793. Here, the Stuarts argue for a new standard by focusing on the context in which the evidence was presented.

¶21 The more relevant inquiry is whether the plaintiff's allegations are supported by direct evidence of discrimination. The *Heiat* analysis applies where discriminatory intent can only be proven by circumstantial evidence rather than by direct evidence. *Reeves v. Dairy Queen, Inc.*, 1998 MT 13, ¶ 15, 287 Mont. 196, ¶ 15, 953 P.2d 703, ¶ 15. We have previously defined direct evidence cases as those in which the parties do not dispute the reason for the adverse action by the employer, but only whether such action constitutes illegal discrimination. *Reeves*, ¶ 16. Pursuant to the framework provided by *Heiat*, the denial of the Stuart loan constitutes illegal discrimination only if the reasons given by the Bank were a pretext for discrimination. Therefore, the case at bar is not a direct evidence case.

¶22 Accordingly, we hold that the District Court properly analyzed the Stuarts' claim pursuant to the test outlined in *Heiat*.

## ISSUE 2

¶23 Did the District Court err when it awarded summary judgment to the Bank?

¶24 The Stuarts next contend that the District Court erred when it held that they failed to provide evidence of discrimination by the Bank. In support of this contention, the Stuarts repeat the factual basis for their suit and argue that the District Court impermissibly decided disputed issues of fact when it granted the Bank's motion for summary judgment. The Stuarts contend that the evidence they presented inferred discrimination and, at the very least, raised material issues of fact which should have precluded summary judgment.

¶25 In a discrimination case, the standard for deciding summary judgment issues is stated in *Heiat*:

> The plaintiff must allege a prima facie case of discrimination in her complaint. In this context, the plaintiff alleges a prima facie case by asserting that plaintiff is a member of a protected class, and that a male colleague with the same credentials,

who performs substantially the same work, receives a higher salary. The employer seeking summary judgment must then come forward with a legitimate nondiscriminatory reason for the disparity. If the employer comes forward with a legitimate nondiscriminatory reason, the plaintiff must then, in addition to having alleged a prima facie case in the complaint, produce evidence that establishes her prima facie case as well as evidence which raises an inference that the employer's proffered reason is pretextual.

Of course, this does not mean that a plaintiff in a discrimination action always survives summary judgment when the plaintiff calls the employer's proffered explanation into question. Rather than having to demonstrate with specific facts that the employer's explanation "is a pretext," she need only introduce evidence which raises an inference that the employer's proffered reason is pretextual. To create a genuine issue of material fact as to pretext, the plaintiff must not only introduce evidence from which a reasonable person could infer that she is qualified, she must also introduce evidence that casts doubt on the defendant's contention that there was a legitimate business justification for defendant's action.

*Heiat, 275 Mont. at 331-32.*

¶26 The elements of a prima facie discrimination case are set out in the Administrative Rules of Montana:

(a) The elements of a prima facie case will vary according to the type of charge and the alleged violation, but generally consist of proof:

i. That charging party is a member of a protected class . . . ;

ii. That charging party sought and was qualified for . . . credit or other opportunity made available by the respondent; and

iii. That charging party was denied the opportunity, or otherwise subjected to adverse action by respondent in circumstances raising a reasonable inference that charging party was treated differently because of membership in a protected class. . . . A.R.M. 24.9.610(2).

¶27 The Stuarts alleged a prima facie case of discrimination by the Bank in their initial Complaint. The Bank then offered legitimate, nondiscriminatory reasons for denying the

Stuarts' loan. The District Court listed the following legitimate reasons for denial based on documents in the record and affidavits filed by the Bank in support of its motion for summary judgment:

1) The Bank's January 23, 1993, lien search showed five creditors who held perfected liens on the growing crops.

2) Douglas was in the middle of a convoluted bankruptcy proceeding.

3) Bank had knowledge of Stuarts' operation and its reliance on Rose's husband. The bank was concerned about the future of the operation should Rose's husband become incapacitated.

4) Although promised, Stuarts did not produce documentation showing how or when the Bank would acquire a first priority lien on the growing crop, crop insurance, and government deficiency payments.

5) Rose's Bankruptcy Plan showed Stuarts owing payments to FmHA and Meissner Tractors. Both parties held liens against Rose's crops until such debt was paid. The Plan also granted a priority lien upon all rents, profits, crops, crop insurance benefits and proceeds, and USDA agricultural program payments and benefits to Wilbur and Yvonne Bigby. Under the Plan, Rose was prohibited from placing consensual or nonconsensual liens upon the property interest to which Bigby's lien attached.

6) Rose had defaulted on an installment payment contract with the Bureau of Indian Affairs (BIA) by failing to make several payments when due.

7) The Internal Revenue Service (IRS) and the Montana Department of Revenue had filed tax claims which were entitled to priority under the Bankruptcy Code.

8) Stuarts' prior primary lender, Milk River PCA, had written off approximately $2,000,000 of promissory notes executed by Stuarts.

9) Rose's January 14, 1993, financial statement indicates an equity position of 19.36%.

10) Other financial institutions had denied Stuarts' loan requests.

¶28 Having established that the first two steps of the *Heiat* test were met, disposition of the issues raised on appeal turns primarily on whether the Stuarts successfully produced evidence to support their prima facie case and whether that evidence raised at least an inference that the Bank's reasons for denial were pretextual. To raise an inference of pretext sufficient to avoid summary judgment, the Stuarts must meet the dual burden of demonstrating that the reasons given were false and that discrimination was the real reason for the Bank's action. *See Heiat*, 275 Mont. at 328, 912 P.2d at 791. Our analysis necessarily subsumes the Stuarts' related claim that genuine issues of material fact existed as to the reasons they were denied credit.

¶29 As set forth in the Administrative Rules of Montana, the first step in proving a prima facie case is demonstrating that the plaintiffs are members of a protected class. The evidence in the record establishes that the Stuarts are Native American, and that Rose is a 65-year-old woman. Admittedly, they are members of a protected class.

¶30 However, the Stuarts did not produce evidence that they qualified for the loan. The Stuarts take issue with Celania's presentation of a loan request for $250,000 rather than the $150,000 actually sought. The Stuarts argue that Celania's mistake raises an issue of fact. However, because the loan request was modified and resubmitted, we conclude that Celania's mistake in the initial presentation did not affect the Executive Loan Committee's eventual decision to deny the Stuart loan application. The record indicates that the Committee considered the proper amount prior to the Bank's denial of Rose's resubmitted loan application on April 19, 1993.

¶31 The Stuarts argue that they orally assured the Bank that it would enjoy a first priority lien as security for the loan. However, the Stuarts fail to cite any authority for the proposition that the Bank must consider an applicant qualified based simply on the potential borrower's assurances that acceptable security will be provided at a later date. In fact, the record reveals that the Bank's lien search turned up prior perfected liens on crops still in the ground and insurance payments. Rose's bankruptcy plan granted additional priority liens on the growing crops. Moreover, the Stuarts were obligated to get consent from the Bankruptcy Court and the IRS before clearing a substantial federal tax lien. Despite the Stuarts' oral assurances, the record reveals no evidence of a subordination agreement by the prior lienholders or any other concrete proposal by the Stuarts to accomplish their stated goal of granting priority to the Bank. Conclusory statements do not raise material issues of fact sufficient to overcome a motion for summary judgment. *Hadford*, ¶ 14. We conclude that the Stuarts did not present evidence that they qualified

for the loan.

¶32 Nor did they produce evidence which suggested the real reason for the denial was their membership in a protected class. An example of the evidence required to establish a reasonable inference that the plaintiff was treated differently because of membership in a protected class is evidence that a similarly situated person outside the protected class was treated more favorably. *See* A.R.M. 24.9.610(2)(b)(ii). The Stuarts attempted to make such a showing by arguing that non-Indian farmers, the McCann brothers and Floyd Frey, received loans from the Bank despite similar credit history. However, these allegations simply reflect the Stuarts' personal observations and conclusions. Unlike the successful plaintiff in *Heiat*, the record does not include affidavits from the similarly situated individuals, nor is there any documentation of their credit history. Without affidavits or other testimony from the individuals the Stuarts allege were in a similar financial situation, no genuine issue of material fact is raised.

¶33 The Stuarts submitted the affidavit of expert witness Stella J. Adams. Adams reviewed the Bank's policies, the Community Reinvestment Act report, and witness depositions before issuing a report. Adams summarized her findings by stating that she "cannot eliminate race as a factor in the Bank's decision." Adams further stated that she could not ascertain whether the Bank "was motivated . . . by racial animus." These statements are not affirmative evidence of racial bias. We agree with the District Court's conclusion that "[t]his type of indeterminate ambiguous statement is not enough to raise a material issue of fact."

¶34 Adams did postulate that "reasonable cause" exists to believe race, sex, and age were factors in the Bank's decision. However, Adams based this opinion on the Bank's failure to evaluate Rose's resubmitted application independent of Douglas and, as discussed previously, Rose's continued reliance on Douglas' assets in her resubmitted application justified the Bank's refusal to evaluate Rose independently.

¶35 The Stuarts also argue that the Bank modified and supplemented its original reasons for denying the loan. The Stuarts contend that the new reasons should not be considered on appeal. The Stuarts further suggest that the inclusion of additional reasons creates the implication of pretext by the Bank. We note in response that the original reasons given in Celania's February 11, 1993 denial letter were sufficient to shift the burden of producing evidence back to the Stuarts pursuant to the *Heiat* analysis. Furthermore, the Stuarts modified their loan application by providing additional collateral and requesting

resubmission. The Bank provided different reasons for denying the loan because the Stuart loan application was never a static proposal. Finally, we recognize that the Bank's issuance of a "Notice of Adverse Action Taken" form which gave additional reasons was part of a procedure intended to formalize Bank policy and was motivated by the desire to conform local lending practices to CRA guidelines. For these reasons, we conclude that the additional reasons for denial were properly considered by the District Court.

¶36 Finally, the Stuarts claim that the FRB report made pursuant to the Community Reinvestment Act is direct evidence of discrimination. However, the report does not present any issue of fact pertinent to the Stuart loan application. In fact, when the Stuarts lodged a complaint with the FRB against the Bank, the board investigated and concluded that the CRA report did not contain sufficient evidence to support allegations that the Stuart loan was denied on the basis of race, national origin, sex, or age.

¶37 The Stuarts did not produce evidence of discrimination, nor did they raise an inference of pretext by demonstrating that the reasons given were false and that discrimination was the real reason for the Bank's action. We affirm the District Court's determination that the Bank was entitled to summary judgment.

## ISSUE 3

¶38 Did the District Court err when it awarded the Bank attorney fees?

¶39 We review discretionary trial court rulings for abuse of discretion. *May v. First Nat'l Pawn Brokers, Ltd.* (1995), 270 Mont. 132, 134, 890 P.2d 386, 388.

¶40 The Stuarts dispute the Distict Court's award of attorney fees by arguing that attorney fees pursuant to the Human Rights Act are rarely awarded unless the suit was frivolous or factually baseless. The Bank disputes the amount of the award based on its contention that the District Court arbitrarily set the amount at $4510. We find that the record supports the District Court's determination that the Bank was entitled to fees and that an award in the amount of $4510 was not an abuse of discretion. We, therefore, conclude that the District Court did not err when it awarded attorney fees.

¶41 For these reasons, we affirm the judgment of the District Court.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ J. A. TURNAGE

/S/ KARLA M. GRAY

/S/ JAMES C. NELSON